

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

August 24, 2022

**BY ECF**

The Honorable Sidney H. Stein
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

     Re:    <u>United States v. Mark Varacchi</u>, 17 Cr. 076 (SHS)

Dear Judge Stein:

     The Government respectfully submits this letter in connection with the sentencing of the defendant, Mark Varacchi, which is scheduled for September 9, 2022, at 2 p.m., to advise the Court of the pertinent facts concerning the substantial assistance that Varacchi has rendered in the investigation and prosecution of others. As detailed below, Varacchi was an important cooperating witness who began cooperating before he had been charged, testified at one proceeding to date, and provided information upon which the Government relied in obtaining the convictions of six individuals in four separate cases. In light of these facts, and assuming that Varacchi continues to comply with the terms of his cooperation agreement, commits no additional crimes before sentencing, and appears for his sentencing as scheduled, the Government intends to move at sentencing, pursuant to Section 5K1.1 of the U.S. Sentencing Guidelines (the "Guidelines" or "U.S.S.G."), that the Court sentence Varacchi in light of the factors set forth in Section 5K1.1(a) of the Guidelines.

## Procedural History

     In or about mid-December 2016, Varacchi's counsel contacted the Government concerning Varacchi's interest in providing information about his own and others' criminal activities. At the time, the Government was not investigating Varacchi, although the U.S. Securities and Exchange Commission (the "SEC") had already begun investigating Varacchi's hedge fund, Sentinel Growth Fund Management, LLC ("Sentinel"). Thereafter, Varacchi began proffering with the Government, including about how he and others, including Jason Rhodes, Steven Simmons, and Joseph Meli, had worked together to defraud Sentinel investors (the "Sentinel Fraud"). Varacchi also provided information about a prior fraud he had engaged in with Rhodes, at Taran Asset Management (the "Taran Fraud"), as well as another scheme (the "Advance Entertainment Fraud") in which Meli defrauded investors in Meli's own company, Advance Entertainment, LLC ("Advance Entertainment"), which purchased tickets to various live events such as theater and musical concerts and resold those tickets in the secondary market. The information that Varacchi

provided about Meli in turn led the Government to discover evidence of fraudulent conduct in the ticket-resale business committed by Craig Carton and Michael Wright. Finally, Varacchi provided information about an individual named Robert Alexander, who defrauded Varacchi and other investors in Alexander's online gaming company, Kizzang LLC.

In addition to attending proffer sessions, Varacchi engaged in numerous consensually recorded phone calls and face-to-face meetings with Simmons and Meli. In those recordings, Simmons and Meli implicated themselves in fraudulent conduct.

Less than two months later, on February 1, 2017, Varacchi pled guilty to all four counts of Information 19 Cr. 076 (the "Information"), which charged him with: conspiracy to commit securities fraud and wire fraud, in violation of Title 18, United States Code, Section 371 (Count One); securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5 (Count Two); and two counts of wire fraud, in violation of Title 18, United States Code, Section 1343 (Counts Three and Four). Varacchi entered his guilty plea pursuant to a cooperation agreement with the Government.

Shortly before Varacchi's guilty plea, on January 27, 2017, Steven Simmons and Joseph Meli were arrested on fraud charges brought in this District. *See United States v. Steven Simmons and Joseph Meli*, 17 Cr. 127 (KMW). Simmons pled guilty pursuant to a plea agreement, and was sentenced on April 3, 2018 to 37 months in prison by the Hon. Kimba M. Wood. Meli pled guilty pursuant to a plea agreement, and was sentenced on April 3, 2018 by Judge Wood to 78 months' imprisonment.

On September 6, 2017, Craig Carton and Michael Wright were arrested on fraud charges brought in this District. *See United States v. Craig Carton and Michael Wright,* 17 Cr. 680 (CM). Carton was convicted following trial, and was sentenced on April 5, 2019 by the Hon. Colleen McMahon to 42 months' imprisonment. Wright pled guilty, and was sentenced on March 7, 2019 by Judge McMahon to 21 months' imprisonment.

On October 16, 2018, Jason Rhodes was arrested on fraud charges brought in this District. *See United States v. Jason Rhodes*, 18 Cr. 887 (SHS). Rhodes subsequently pled guilty, and was sentenced on September 1, 2021 to 48 months' imprisonment by this Court. Varacchi testified at a *Fatico* hearing in connection with Rhodes's sentencing.

On February 7, 2019, Robert Alexander was arrested on fraud charges brought in this District. *See United States v. Robert Alexander*, 19 Cr. 164 (ALC). Alexander pled guilty on January 8, 2020 before the Hon. Andrew L. Carter Jr., and is still awaiting sentencing.

## Background

Varacchi was born in Queens, New York, and is now 53 years' old. Varacchi graduated in 1991 from the University of Bridgeport with a Bachelor's of Science in banking and finance. Varacchi began his career in finance as an entry level trade support employee at Tiger Management, a long/short hedge fund, eventually working his way up to become head of the

operations department. Varacchi also worked early on for a brief period at Bear Stearns as an internal control accountant.

Most of Varacchi's career has been focused on the operation of hedge funds. From 1998 through 2004, Varacchi was Chief Operations Officer ("COO") for a hedge fund named Calypso Capital Management, LP. Varacchi left Calypso after realizing he would not be made a partner and, together with another individual formed a hedge fund named XI Asset Management focused on technology, media and telecommunications ("TMT") stocks. In July 2007, Varacchi signed a deal with a hedge fund named Diamondback Capital whereby XI Asset Management was absorbed into Diamondback. Varacchi then became the senior operations person at Diamondback. Varacchi left Diamondback in or about 2010 because he was not given an opportunity for advancement.

After leaving Diamondback, Varacchi consulted for various new hedge funds, helping with their operations. One of the funds Varacchi consulted for was Quidnet, which folded after investing in a hedge fund named Absolute Fund LP, run by Jason Konior, who was convicted of wire fraud in 2013.

## Offense Conduct

1. **The Taran Fraud**

Beginning in or about 2011 or 2012, Varacchi took a full-time position with Taran Asset Management ("Taran"), the management arm of the Taran Offshore Fund, a long/short hedge fund that specialized in TMT stocks. Varacchi's job as COO of Taran was to run everything aside from the investments. Varacchi was to receive an approximately 20% stake in Taran and a reasonable salary of between $100,000 and $150,000 per year, but Varacchi had no written about these terms. As COO of Taran, Varacchi engaged various vendors to provide services to Taran. Two of these vendors were operated by Jason Rhodes, later to become Varacchi's partner in Sentinel: ConceptONE, which conducted risk management and generated a daily risk report analyzing Taran's portfolio and Skyhawk, through which Rhodes provided other consulting services to Taran.

Between 2011, when Varacchi first joined Taran, and 2013, when Taran ceased operations, Varacchi engaged in a scheme with Rhodes to embezzle approximately $1 million from Taran. This embezzlement occurred in two main ways. First, Varacchi would simply withdraw, without authorization, cash from Taran's management account at JP Morgan Chase. The second major way Varacchi embezzled from Taran was a multi-step process. Varacchi would conduct sham transactions within Taran's brokerage accounts to generate "soft dollars." Varacchi would then persuade vendors to issue inflated or false invoices to Taran (or would himself create them with the vendors' knowledge). Varacchi, as COO of Taran, would then direct payment of the vendors' invoices from soft dollars in Taran's brokerage account. The vendor would then kick back a portion of the inflated payments to Varacchi. Varacchi also paid inflated invoices submitted by Rhodes for the vendors Rhodes controlled, ConceptONE and Skyhawk, in order to benefit Rhodes. In total, Varacchi embezzled approximately $1 million from Taran, with a portion of those funds going to Rhodes.

3

In or about January 2013, Taran suffered a significant loss and investors redeemed their investments. Varacchi then began thinking of opening his own hedge fund. Varacchi offered to buy Taran, but its owner refused. Varacchi then began Sentinel together with Rhodes.

2.  **The Sentinel Fraud**

In or about late 2013, Varacchi and Rhodes co-founded Sentinel as equal partners. Rhodes and Varacchi managed Sentinel, and Steven Simmons solicited investments for Sentinel though his separate firm named Sideris Capital Partners ("Sideris"). Varacchi also had significant direct contact with investors, who Varacchi solicited for investments in Sentinel.

Shortly after Sentinel was founded, Varacchi and Rhodes, along with Simmons, began operating Sentinel as a Ponzi-like scheme by misappropriating more than $25 million of investor funds for personal use, to repay prior investors, and to pay Sentinel's expenses. Varacchi, Rhodes, and Simmons took elaborate steps to conceal and carry out the fraud. For example, they prepared falsified account statements and performance updates that were then sent to investors, and Rhodes shifted funds among various accounts to create misleadingly inflated account balances.

a.  **Background on Sentinel**

Sentinel managed two funds. Initially, Sentinel managed a fund named Radar Alternative Fund, L.P. ("Radar L.P."), which engaged in both a long-short trading strategy and an initial public offering ("IPO") strategy. The long-short strategy focused on the purchase or short sale of publicly traded stock, betting that the stock would either increase or decrease in value. The IPO strategy involved obtaining allocations of stock from IPOs or secondary offerings in the hopes that the securities would increase in value once they started trading. In or about early 2015, Sentinel opened a second fund, Radar Alternative Fund SPC ("Radar SPC"), to separate the two strategies, with Radar L.P. focused on the IPO strategy and Radar SPC focused on the long-short strategy.

Sentinel's business model was to attract "emerging" or start-up hedge fund managers who had limited assets under management—often their own funds or investments by family or friends—and entice those managers to join the Sentinel platform—*i.e.*, place their investor money in Sentinel accounts and trade through Sentinel. Sentinel promised these managers that Sentinel would provide additional investment dollars for these managers to invest. Sentinel also solicited investments directly from wealthy individuals or families by promising these investors that their funds would be invested in stocks by the emerging portfolio managers. Sentinel thus had two types of investors—the portfolio manager investors who placed their funds with Sentinel, and the individuals or family investors whose money Sentinel promised to invest through the portfolio managers.

Investors in both of Sentinel's funds were promised verbally and in private placement memoranda ("PPM") that their money would solely be invested in stocks. As set forth in the PPM's, Rhodes was the "sole principal" of the investment adviser to the Radar L.P. fund and, together with Varacchi, controlled the management and operations of the investment manager to Radar SPC.

The PPMs for Sentinel's funds also set forth the fees to which Sentinel was entitled for managing the funds. Per the PPMs, Sentinel was entitled to a management fee of 1.5% annually for assets in the Radar L.P. fund and 1% annually for assets in the Radar SPC Fund. Sentinel was also entitled to a performance fee, which only applied if the fund earned profits.[1] Aside from these fees, Sentinel was not entitled to take any investor funds to operate its business or for payments to Varacchi or Rhodes.

Sentinel's funds—*i.e.*, the investor monies in the Radar L.P. and later the Radar SPC funds, were (or should have been) deposited with Sentinel's prime broker, Weeden & Co. Rhodes had authority with Weeden to disburse or withdraw investor funds from the Weeden accounts.[2] Sentinel, the management company, maintained one principal management account (the "Sentinel Management Account"). While both Rhodes and Varacchi had signature authority over the Sentinel Management Account, Varacchi principally conducted the transactions in that account. Both Rhodes and Varacchi also had separate Sentinel corporate credit cards.

Weeden had in place certain safeguards to ensure that investor funds were disbursed properly. Each request for a disbursement of investor funds was required to be submitted on a form (a "Redemption Form") signed by Rhodes as the sole principal on the accounts. Following the submission of this form, a representative of Weeden would call Rhodes—as the only authorized signatory on the brokerage accounts— to verify that he agreed with the form and with the wire being sent out. Varacchi sometimes signed Rhodes's name on the disbursement form, but only with Rhodes's permission.

### b. Embezzlement of Sentinel Investor Funds

Almost from the beginning, Varacchi and Rhodes began misappropriating Sentinel investors' money. In total, Varacchi and Rhodes participated in defrauding more than 30 investors out of approximately $25,451,801 and engaging in complex and convoluted transactions to conceal the fraud. The misappropriated money was used to pay for Rhodes and Varacchi's personal expenses, to pay Sentinel expenses (well beyond the fees to which Sentinel was entitled), and to repay earlier investors whose investments had already been misappropriated, as detailed in part below.

One of the scheme's victims was Brett Crawford, an emerging portfolio manager who ran a fund named Flatiron Partners. To entice Crawford to join Sentinel, Rhodes and Varacchi agreed to lie to him, telling him that Sentinel had another investor whose funds would be placed under Crawford's management. In reality, no such other investor existed. Between March 2015 and May 2016, Crawford wired more than $4 million to Sentinel, all of which money Rhodes and Varacchi misappropriated over time. Rhodes and Varacchi provided Crawford with fraudulent

---

[1] Sentinel earned little or no profits during its existence.

[2] While Sentinel's prime broker throughout its existence was always Weeden, the custodian which actually held the Funds' securities and cash started as Goldman Sachs Execution Corporation ("GSEC") and later changed to the Industrial and Commercial Bank of China ("ICBC"). As is typical in the hedge fund industry, Rhodes and Varacchi generally interacted only with Weeden, the prime broker, and not with the custodian.

account statements by using leverage to make it appear that Crawford's subaccount was fully funded while, in reality, the entire Radar L.P. account contained far less than Crawford's balance.

Another investor Rhodes defrauded was A.L. Sarroff ("Sarroff"), an investment entity operated by Alan Sarroff and Larry Smith. By in or about October 2015, Rhodes and Varacchi had misappropriated Sarroff's investment, which by that time should have been approximately $4 million. In late November 2015, Sarroff demanded an account statement showing its money in Sentinel's Weeden account. Rhodes and Varacchi agreed to create a fake account statement to fulfill Sarroff's request. As reflected in e-mails, on November 24 and 25, 2015, Rhodes and Varacchi altered the October 2015 account statement for Crawford's subaccount at the prime broker and changed numbers on the statement to make it appear as though it pertained to Sarroff and that Sarroff's investment was secure. On November 25, 2015, Varacchi forwarded the fake statement to Sarroff, copying Rhodes and falsely representing that Sarroff's balance was $4,170,753.

Sarroff learned that the account statement was fraudulent and threatened Rhodes and Varacchi that he would report them to the authorities unless Sentinel quickly returned his money.[3] These threats led Rhodes and Varacchi to defraud yet other investors, including Carol Ferrante, an individual Sentinel investor, who invested approximately $500,000, and the Dartley Grandchildren, L.L.C. ("Dartley"), a fund set up as an investment vehicle by an individual investor for his grandchildren, which invested nearly $1 million. Both of these investors were told that their money would be invested in stocks when, in fact, it was used to repay a prior investor as part of the Ponzi scheme.

Dartley's investment was solicited by Steven Simmons, who did not work for Sentinel but solicited portfolio managers and investors to Sentinel through an entity Simmons controlled named Sideris Capital Partners. Varacchi, Simmons, and Rhodes worked together to create fake performance reports for Dartley, including gathering performance data for portfolio managers who had been represented to Dartley as managing Dartley's investment but who in fact had no relationship with Sentinel and creating spreadsheets with the false investment return data. Simmons also solicited a $6 million investment into Sentinel from another individual investor named Neila Fortino. Simmons immediately misappropriated $2 million of Fortino's investment himself, forwarding only $4 million of her investment to Sentinel. Rhodes and Varacchi, together with Simmons, subsequently misappropriated the rest of Fortino's investment.

Varacchi has not paid taxes on any of the funds he embezzled from Sentinel, or from Taran.

**Cooperation and Significance of Assistance**

Varacchi provided substantial assistance in the investigation of Rhodes, Simmons, Meli, and another individual named Robert Alexander, leading to convictions for each of those

---

[3] Sarroff initially demanded that it be sent an account statement directly by Weeden to compare to the statement sent by Varacchi and Rhodes. Rhodes lied and represented that he could not authorize the disclosure of the statement without the consent of Sentinel's portfolio managers.

individuals for significant fraudulent conduct. Varacchi's assistance also led to the convictions of two of Meli's criminal associates, Craig Carton and Michael Wright.

Varacchi began meeting with the Government before he was charged in this matter, and over the course of numerous proffers provided credible and valuable information about his own and others' misconduct. Varacchi's assistance was instrumental in the Government's ability to charge and convict Simmons, Rhodes, Meli, and Alexander. Varacchi would have been the single most important witness against Rhodes and Simmons had either proceeded to trial, and he would have also been an important witness against Meli and Alexander.[4]

As discussed above, Varacchi's interactions with law enforcement about this case began in December 2016, when Varacchi's counsel approached the Government. At the time, the Government was not investigating Varacchi, although the U.S. Securities and Exchange Commission had begun investigating Sentinel. Beginning in December 2016, Varacchi began proffering with the Government. From the beginning Government, Varacchi was truthful about his participation in both the Sentinel and Taran Frauds. Varacchi was fully forthcoming about his own criminal intent and expressed remorse for his participation in the schemes.

During proffer sessions, Varacchi provided detailed and corroborated information about the Sentinel Fraud, including the roles played by Rhodes, Simmons, Meli, and Varacchi himself. Varacchi detailed how he, Rhodes, and Simmons misappropriated millions of dollars in Sentinel investor funds, lied to investors about how their funds were being used, and operated Sentinel in a Ponzi-like fashion. Varacchi also explained how Meli helped further the Sentinel fraud by providing funds to repay an investor who threatened to report Sentinel to the SEC.

Varacchi also provided information about Meli's operation of the Advance Entertainment Fraud. Varacchi relayed that Meli operated a business named Advance Entertainment, LLC, which purchased wholesale tickets to various live events, such as Broadway shows, and resold those tickets at a profit. Varacchi further relayed that Meli stated that the money Meli loaned Sentinel consisted of investor funds from Advance Entertainment, *i.e.*, that instead of using those investor funds to purchase wholesale tickets, Meli loaned those investor funds to Sentinel. The Government's subsequent investigation into Meli and the Advance Entertainment Fraud determined that Meli had defrauded investors in his company of over $100 million, and also that Meli had conspired with Craig Carton and Michael Wright in that fraudulent scheme.

Soon after he first began proffering, Varacchi began proactively cooperating in the Government's investigation. In particular, Varacchi made approximately four consensual recordings with Simmons and approximately five with Meli, both telephonically and in person. In these recordings, among other things, Simmons acknowledged soliciting a $600,000 investment from one Sentinel investor in late December 2015 for the purpose of repaying another, discussed falsifying Sentinel account statements, and suggested that Varacchi and he take a portion of investor funds to Las Vegas in the hopes of winning a sufficient amount to repay other investors. The recorded conversations with Meli were also highly useful in the Government's investigation.

---

[4] Because Alexander has not yet been sentenced, Varacchi may yet be called to testify or submit an affidavit at a future proceeding in that case.

7

In those recordings, Meli admitted that he had been playing a "shell game" with his investors by using new investor money to repay prior investors, and also that he engaged in a "fraudulent ticket deal."

On or about February 1, 2017, Varacchi pled guilty to charges relating to his participation in the Sentinel Fraud (Counts One, Two, and Three of the Information) and the Taran Fraud (Count Four). Thereafter, he met with the Government on numerous occasions to continue to assist with the Government's investigations and to prepare to testify at Rhodes's trial (which did not occur due to a last-minute guilty plea by Rhodes) and a *Fatico* hearing in connection with Rhodes's sentencing, which took place on April 13 and 14, 2021. In total, Varacchi met or spoke with the Government for proffers or preparation sessions dozens of times.

At Rhodes's *Fatico* hearing, Varacchi was the Government's most important witness, and he provided powerful testimony about Rhodes's participation in both the Sentinel and Taran Frauds as only an inside participant could. In particular, Varacchi testified in detail about his long-standing relationship with Rhodes, their prior participation in the Taran Fraud, their founding and operation of Sentinel, and how Rhodes was a knowing participant in the full scope of the Sentinel Fraud. Varacchi was fully forthcoming about his own mental state and participation in the Sentinel and Taran Frauds. He provided critical details that helped to illuminate Rhodes's criminal intent, and that served to rebut Rhodes's argument that he played only a limited role in the Sentinel Fraud.

Varacchi also provided useful information in the Government's investigation of Robert Alexander. *United States v. Alexander*, 19 Cr. 164 (ALC). From 2013 through 2017, Alexander defrauded investors of over $1.3 million that they invested in his company, Kizzang LLC. Alexander told investors that their money would be used for Kizzang's business purposes, but instead he spent much of it on his own personal use, including paying for his personal credit cards, his rent, and a luxury motor vehicle, and funding gambling excursions to casinos. Varacchi was one of Alexander's victims, and provided information to the Government about misrepresentations made by Alexander concerning Kizzang. That information was critical to the Government's investigation and eventual prosecution of Alexander. Alexander pled guilty but has indicated that he wishes to have a *Fatico* hearing, at which Varacchi has agreed to testify or make an affidavit submission. The Government anticipates that Varacchi's testimony or affidavit will be very helpful at such a hearing, to prove both number of investors as well as the total loss amount.

In sum, Varacchi provided critical, well corroborated information about multiple subjects engaged in significant fraudulent activities.

### Section 5K1.1 Factors

Section 5K1.1 of the Guidelines sets forth five non-exclusive factors that sentencing courts are encouraged to consider in determining the appropriate sentencing reduction for a defendant who has rendered substantial assistance. *See* U.S.S.G. § 5K1.1(a). The application of each of those factors to Varacchi's cooperation is set forth below.

Significance and usefulness of the defendant's assistance (§ 5K1.1(a)(1))

Varacchi's cooperation has been highly useful.  He has provided credible and important information about significant fraudulent activity committed by multiple individuals, including Rhodes, Simmons, Meli, and Alexander, as well as his own crimes.  Varacchi's information also resulted in investigative leads that ultimately led to successful prosecutions of both Carton and Wright.

Varacchi's historical information and anticipated testimony as to Rhodes was a significant factor in the Government's ability to charge Rhodes, secure a guilty plea, and prevail on all disputed issues at Rhodes's *Fatico* hearing.  Varacchi's testimony at the Rhodes *Fatico* hearing was credible and compelling, and it provided an important narrative picture of Rhodes's role at Sentinel.  Without Varacchi's cooperation, the Government would not have been able to present a first-person account of the Sentinel and Taran Frauds, but rather would have had to rely largely on documentary evidence.

Varacchi's proactive cooperation against Simmons and Meli, and availability as a witness against them, helped the Government charge and secure guilty pleas from both of those defendants.  Further, Varacchi's information about Meli ultimately led the Government to evidence that Carton and Wright operated as Meli's co-conspirators in his ticket-resale investment scheme, and that evidence resulted in successful prosecutions against both Carton and Wright.

Finally, Varacchi also provided information about Alexander that would have made Varacchi an important witness for the Government should Alexander have proceeded to trial, and that will make Varacchi an important witness at the anticipated *Fatico* hearing in that case.

Each of these cases were important fraud prosecutions for the Government, and each resulted in judges in this District imposing significant sentences for the serious criminal conduct at issue.  Simmons was sentenced to 37 months' imprisonment; Meli was sentenced to 78 months' imprisonment; Rhodes was sentenced to 48 months' imprisonment; Carton was sentenced to 42 months' imprisonment; and Wright was sentenced to 21 months' imprisonment.  As noted above, Alexander is still awaiting sentencing.

Truthfulness, completeness, and reliability of any information or testimony (§ 5K1.1(a)(2))

Varacchi was fully forthcoming about his own misconduct and the misconduct of others.  As noted, Varacchi's information was extensively corroborated by other evidence.

Nature and extent of the defendant's assistance (§ 5K1.1(a)(3))

Varacchi met extensively with the Government both before charges were brought against him and others and in preparation for testimony.  Varacchi's cooperation also went beyond meetings with the Government, and included proactive cooperation against Simmons and Meli in which Varacchi was able to make inculpatory consensual recordings of both individuals.

During the Rhodes *Fatico* hearing, Varacchi testified for approximately two days, during which he was subject to extensive cross-examination. This Court fully credited Varacchi's testimony in ruling for the Government on all disputed issues raised in the hearing.

Any injury suffered, or any danger or risk of injury to the defendant or her family resulting from her assistance (§ 5K1.1(a)(4))

Varacchi has been the subject of multiple threatening or intimidating acts due to his cooperation. On or about January 27, 2017, after Simmons was arrested and was informed that Meli had also been arrested, Simmons stated to the FBI, in substance and in part, "tell me [Meli] was arrested for putting two slugs in the back of Varacchi's head." Additionally, on or about December 6, 2018, Varacchi received a package that contained a note calling him a "rat" along with a number of cheese products. The Government investigated the incident, but ultimately was not able to determine the sender.

Timeliness of the defendant's assistance (§ 5K1.1(a)(5))

Varacchi's assistance was highly timely. He began proffering with the Government prior to his or anyone else's being charged with the crimes discussed in this letter. He pled guilty to federal charges relating to the Sentinel and Taran Frauds less than two months after his lawyer first approached the Government. The information he provided was critical to the Government's ability to charge and convict Rhodes, Simmons, Meli, and Alexander, and resulted in investigative leads that ultimately led to successful prosecutions against both Carton and Wright.

## Conclusion

As set forth above, the Government believes that Varacchi provided substantial assistance to the Government. Accordingly, as discussed, assuming Varacchi continues to comply with the terms of his cooperation agreement, the Government intends to request at sentencing that the Court sentence Varacchi in light of the factors set forth in Section 5K1.1(a) of the Guidelines.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:   /s/ Jared Lenow
Jared Lenow
Assistant United States Attorney
Southern District of New York

cc: Rodney Villazor, Esq. (by ECF)